IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division



FERNANDO LIGHTFOOT,

    Plaintiff,

v.                    Civil Action No. 3:16cv910

RICHMOND PUBLIC SCHOOLS,
et al.,

    Defendants.

## MEMORANDUM OPINION

This matter is before the Court on DEFENDANT DAVID HUDSONS'S MOTION TO DISMISS (ECF No. 27). For the reasons set forth below, the motion will be granted.

## PROCEDURAL BACKGROUND

Fernando Lightfoot ("Lightfoot") filed the COMPLAINT (ECF No. 1) on November 14, 2016. Lightfoot alleged several claims against several individuals affiliated with Linwood Holton Elementary School.

The parties in this case previously attended an initial pretrial conference on April 19, 2017. Based on the Court's review of the COMPLAINT (ECF No. 2), DEFENDANT DAVID HUDSON'S MOTION TO DISMISS (ECF No. 7), the MOTION TO DISMISS[1] (ECF No.

---

[1] The Motion to Dismiss was filed on behalf of the School Board for the City of Richmond ("RPS"), Kimberly Gray ("Gray"),

12), and the supporting and opposing memoranda, the Court determined that the Complaint did not adequately set forth which claims were presented against which defendants nor did the Complaint set forth plausible claims within the meaning of Bell Atlantic v. Twombly, 550 U.S. 544 (2007); Ashcroft v. Iqbal, 550 U.S. 662 (2009).  Therefore, the Court granted the motions to dismiss, and dismissed the Complaint in its entirety without prejudice.

Lightfoot filed an AMENDED COMPLAINT (ECF No. 23) on May 10, 2017.  The Amended Complaint names the following individuals as defendants[2]:  Richmond Public Schools ("RPS")[3], Dana T. Bedden

---

individually and in her official capacity as a member of the RPS Board, Kristen Larson ("Larson"), individually and in her official capacity as a member of the RPS Board, Donald Coleman ("Coleman"), individually and in his official capacity as a member of the RPS Board, Jeffrey Bourne ("Bourne"), individually and in his official capacity as a member of the RPS Board, Derik Jones ("Jones"), individually and in his official capacity as a member of the RPS Board, Glen Sturtevant ("Sturtevant"), individually and in his official capacity as a member of the RPS Board, Dana T. Bedden ("Bedden), individually and in his official capacity as Superintended at Richmond Public Schools, and Anthony Leonard ("Leonard"), individually and in his official capacity as Executive Director of Elementary Schools at Richmond Public Schools.

[2] The Plaintiff did not include several individuals whom he had previously included as Defendants in the original complaint.

[3] In the original Complaint, Lightfoot incorrectly identified one of the Defendants as Richmond Public Schools ("RPS").  The Defendant corrected the Plaintiff's error in the original motion to dismiss, highlighting that the proper name for the Defendant is the School Board of the City of Richmond.  Plaintiff Lightfoot has continued to identify the Defendant with the

("Bedden"), individually, and David Hudson, individually. The Amended Complaint sets forth six claims. COUNT 1 asserts a violation of Title VII, and, although it is described as "Hudson's Sexual Harassment of Lightfoot," the count is alleged only against RPS. (AC, ¶ 23). COUNT 2 asserts a violation of Title VII, and, although it is described as "Hudson's Retaliation Against Lightfoot Because He Rejected Hudson's Sexual Overtures," it is alleged only against RPS. (AC, ¶ 31). COUNT 3 asserts a violation of Title VII, and, although it is described as "Retaliation Hudson Recommends Nonrenewal of Lightfoot's Assistant Principal Position," it is only alleged against RPS. (AC, ¶ 36). COUNT 4 asserts a claim against Hudson for Hudson's Tortious Interference with Lightfoot's Employment Contract. COUNT 5, alleged against RPS and Bedden, challenges Bedden's Decision to Nonrenew Lightfoot's Contract as a violation of Lightfoot's Due Process Rights. COUNT 6, also alleged against RPS and Bedden, asserts Bedden's Failure to Give Lightfoot an Opportunity to Respond as a denial of Lightfoot's Procedural Due Process Rights.

The general language in Hudson's motion to dismiss reads as if the Amended Complaint asserts more than one claim against Hudson. However, Hudson's brief only seeks dismissal of COUNT

---

improper name and the acronym RPS. For purposes of this Opinion, the Court will continue to refer to the Defendant as "RPS".

4, the Tortious Interference by Hudson with Lightfoot's Employment Contract which is the only claim against Hudson.[4] In deciding the motion to dismiss, the facts, as alleged, must be taken as true.

## FACTUAL ALLEGATIONS

The Amended Complaint alleges that, in the summer of 2014, Lightfoot worked as a school counselor for the Richmond Public School ("RPS"). (AC, ¶ 12). Hudson was, and remains, the Principal of Linwood Holton Elementary School. Id. at ¶ 11. In the summer of 2014, during a track meet, Hudson approached Lightfoot and stated that Lightfoot looked familiar. Id. "Lightfoot told Hudson that he was currently seeking an administrative position and Hudson responded that he was seeking to appoint an assistant principal at Holton Elementary and that Lightfoot should send him his resume." Id. at ¶ 14. "Hudson told Lightfoot that his lack of experience and training did not matter to him because he would mentor and teach him everything that he needed to know and that he would develop Lightfoot into a principal in two to three years." Id. at ¶ 17.

Hudson subsequently recommended to Anthony Leonard ("Leonard"), the Assistant Superintendent of RPS, and Dana T.

---

[4] Hudson's motion and briefs are about as difficult to fathom as is Lightfoot's Amended Complaint, but, given a reasonable construction, Hudson's briefs attack only COUNT 4 of the Amended Complaint.

4

Bedden ("Bedden"), the Superintendent of RPS, that Lightfoot be considered for the position of assistant principal at Holton Elementary. Id. at ¶ 19. "Leonard and Bedden did not agree with Hudson's request pointing out to Hudson that Lightfoot lacked classroom and supervisory experience during his employment with RPS." Id. at ¶ 20. "Hudson was resolute and insistent . . . [and] Bedden and Leonard reluctantly approved the appointment." Id. at ¶¶ 21-22.

"During the first week of September 2014, which was at the start of the 2014-2015 school year", Lightfoot noticed "Hudson was intently gazing at his crotch." Id. at ¶ 24. Hudson said to Lightfoot, "I have expensive taste -[sic] you need to take me to the Ritz-Carlton in Washington, DC." Id. at ¶ 25. Lightfoot decided not to respond to Hudson's sexually suggestive comment, for fear that "any response would have jeopardized his position." Id. at ¶ 27. Lightfoot alleges that Hudson made at least ten or more sexually suggestive comments to him after the first incident, "such as, 'when are you going to take me to dinner?'" Id. at ¶ 29.

"When it became clear to Hudson that Lightfoot was not interested in his sexual overtures, Hudson began a campaign to punish Lightfoot's rejection of his sexual overtures which created for Lightfoot a hostile work environment." Id. at ¶ 33. "In the last week of August, 2014, Hudson gave Lightfoot a list

of items to complete but did not specify the time in which he expected the list to be completed." Id. at ¶ 36(a). When Lightfoot did not finish the tasks by the next week, "Hudson responded that he felt that a week was ample time to complete the list. When Lightfoot explained that he needed more time and help to complete the list, Hudson replied, "I can't evaluate you if I don't know what you can do." Id. at ¶ 36(c). In November of 2014, Lightfoot asked Hudson for help regarding a science museum field trip but "Hudson refused and told Lightfoot that he, Hudson, needed to see what he, Lightfoot, could do." Id. at ¶ 36(e). On another occasions, Hudson told Lightfoot "to revise the cafeteria schedule and rearrange the cafeteria tables and adjust the lunch times." Id. at ¶ 36(f). Because of his short tenure in his position, Lightfoot did not know the details to complete this task and "Hudson offered Lightfoot no assistance with regard to this task." Id.

On February 9, 2015, Hudson delivered a letter to Lightfoot, regarding an "IEP" meeting on February 4, 2015 "which Lightfoot inadvertently failed to attend because he was at the University of Richmond attending a Leadership Academy meeting." (AC, ¶ 37). The letter indicated that Hudson was concerned about Lightfoot's performance as assistant principal. Id.

In response to the letter, Lightfoot requested a meeting with Leonard in order to "advise him of Hudson's treatment and

6

to seek his advice." Id. at ¶ 38. Lightwood did not reveal to Leonard the alleged harassment by Hudson but instead described the "other" treatment by Hudson. Id. at ¶ 41. Leonard advised Lightfoot that Hudson had already spoken with him prior to the meeting and Hudson told Leonard about Lightfoot missing the IEP meeting. Id. at ¶ 40. Leonard subsequently called Hudson and explained that "Hudson had fought to get Lightfoot hired" and therefore "Hudson now had to mentor and train Lightfoot . . . ." Id. ¶ 42.

The next day, Hudson made a comment to Lightfoot stating, "Oh, you went to Dr. Leonard to tell on me" to which Lightfoot did not respond. Id. at ¶ 43. The following day, Hudson told Lightfoot he was going to "non-renew" him, and told Lightfoot "Trust me, I will get you." Id. at ¶¶ 43-44.

In March 2015, Hudson recommended to Bedden that, because of "alleged performance problems" Lightfoot be non-renewed as an assistant principal for the 2015-2016 year. Id. at ¶ 46. "Hudson turned over to HR several letters which he claimed he gave to Lightfoot at the time they were written." Id. at ¶ 47. One of the letters, dated September 9, 2014, reflect Hudson's concerns that "Lightfoot was not meeting his timelines and that his productivity was in need of evaluation." Id. at ¶ 48. Lightfoot "concedes that he received" the letter; however, he alleges that "Hudson falsely claimed Lightfoot signed it." Id.

Hudson also turned over two other letters, one from November 24, 2014 and one from February 9, 2015.  Lightfoot alleges that he never received either letter.  These letters were also critical of Lightfoot's performance.  Id. at ¶¶ 52-55.

## ANALYSIS AND APPLICATION OF LAW

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) challenges the legal sufficiency of a complaint.  Jordan v. Alternative Resources Corp., 458 F.3d 332, 338 (4th Cir. 2006). When deciding a motion to dismiss under Rule 12(b)(6), a court must "draw all reasonable inferences in favor of the plaintiff." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 253 (4th Cir. 2009).  While the court "will accept the pleader's description of what happened" and "any conclusions that can be reasonably drawn therefrom," the court "need not accept conclusory allegations encompassing the legal effects of the pleaded facts." **Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure** § 1357 (3d ed.1998); Chamblee v. Old Dominion Sec. Co., L.L.C., No. 3:13CV820, 2014 WL 1415095, *4 (E.D. Va. 2014).  Nor is the Court required to accept as true a legal conclusion unsupported by factual allegations.  Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009).

Hudson challenges the legal sufficiency of COUNT 4 (the alleged tortious interference with Lightfoot's contract) for several reasons.  Each will be considered in turn.

**A.** **Whether There Was A Contract And Whether A Breach Is Alleged**

"It is well-settled in Virginia that, to establish a prima facie claim for tortious interference with contract, a plaintiff must plead the following elements: (1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of that contractual relationship or business expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted." Storey v. Patient First Corp., 207 F. Supp. 2d 431, 447 (E.D. Va. 2002); Chaves v. Johnson, 230 Va. 112 (1985).

Hudson first argues that the Amended Complaint fails to allege the existence of a contract and a breach of that contract, thereby asserting the absence of the first and third elements of a tortious interference with contract claim. Hudson says, "[t]o the extent the Plaintiff is relying on an employment contract with the School Board, he has not identified a breach of its actual terms." ("Memorandum in Support Motion to Dismiss")(ECF No. 28). To determine whether there was a tortious interference with a contract, it is first necessary to determine whether a contract did in fact exist. Hudson posits that Lightfoot, in making his claim for tortious interference with a contract, seems to be relying on the terms of a supposed

9

contract created between Lightfoot and the School Board, RPS, because the Amended Complaint asserts that Hudson was "singularly responsible for creating" the assistant principal contract.  Hence, it does appear that the contract with which Hudson is alleged to have tortuously interfered was the contract by which Hudson was employed as Assistant Principal.

That is a probationary contract under Virginia law, pursuant to which a teacher who has not achieved continuing contract status is entitled to a contract for the ensuing school year, if the teacher has not received the appropriate notice of nonrenewal.  **Va. Code Ann. § 22.1-304.**  The statute provides that "written notice of nonrenewal of the probationary contract must be given by the school board on or before June 15 of each year."  Once a teacher has completed the probationary period, he/she is entitled to a continuing contract.  Id.

The Amended Complaint alleges that Lightfoot was employed as a new assistant principal at Linwood Holton Elementary.  And, as described, Lightfoot was employed as a probationary teacher. Thus, upon notification that his probationary contract would not be renewed, the original contract expired at the end of its one year term and was not susceptible of being renewed.  As a new assistant principal, Lightfoot's probationary contract did not continue if he was notified that it would not be renewed.

Relying on Pettis v. Nottoway Cty. Sch. Bd., 592 F. App'x
158, 160 (4th Cir. 2014), Lightfoot attempts to show that there
is no real distinction between a termination and a nonrenewal
"because a nonrenewal of a contract at least within public
education is tantamount to a contract termination." (ECF No.
30). The unpublished decision by the Fourth Circuit does not
support Lightfoot's position. The claim in Pettis was a Title
VII claim, not a claim for tortious interference with a
contract. Throughout the opinion, the Fourth Circuit refers to
the decision by the defendant schoolboard as the "nonrenewal of
[Pettis's] contract," not a termination. The Fourth Circuit
concluded that the non-renewal was "an adverse employment
action, not that the non-renewal was the termination of a
contract. Pettis is neither controlling nor persuasive here.

The Amended Complaint provides no plausible basis for a
finding that Lightfoot had a contract with RPS that was
susceptible of interference.[5] Nor does the Amended Complaint
allege the breach of a contract. For this reason alone, COUNT 4
will be dismissed.

_____

[5] Nor does the Amended Complaint allege the elements of a claim
for interference with a business or contract expectancy.

**CONCLUSION**

For the reasons set forth above, DEFENDANT DAVID HUDSONS'S MOTION TO DISMISS (ECF No. 27) will be granted and COUNT 4 will be dismissed with prejudice.

It is so ORDERED.

                                    /s/    *REP*
                          _____
                          Robert E. Payne
                          Senior United States District Judge


Richmond, Virginia
Date:  August _11_, 2017