IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division



FERNANDO LIGHTFOOT,

    Plaintiff,

v.                            Civil Action No. 3:16cv910

RICHMOND PUBLIC SCHOOLS,
et al.,

    Defendants.

**MEMORANDUM OPINION**

This matter is before the Court on the MOTION TO DISMISS AMENDED COMPLAINT (ECF No. 25), filed by Defendants the School Board for the City of Richmond ("RPS") and Dana T. Bedden ("Bedden")(collectively the "Defendants"). For the reasons set forth below, the motion will be granted.

**PROCEDURAL BACKGROUND**

Fernando Lightfoot ("Lightfoot") filed his original COMPLAINT (ECF No. 1) on November 14, 2016. Lightfoot alleged several claims against multiple individuals affiliated with Linwood Holton Elementary School.

The parties in this case attended the initial pretrial conference on April 19, 2017. Based on the Court's review of the COMPLAINT (ECF No. 2), DEFENDANT DAVID HUDSON'S MOTION TO

DISMISS (ECF No. 7), the MOTION TO DISMISS[1] (ECF (ECF No. 12), and the supporting and opposing memoranda, the Court determined that the Complaint did not adequately set forth which claims were presented against which defendants nor did the Complaint set forth plausible claims within the meaning of <u>Bell Atlantic v. Twombly,</u> 550 U.S. 544 (2007); <u>Ashcroft v. Iqbal,</u> 550 U.S. 662 (2009). Therefore, the Court granted the Defendants' motions to dismiss, and dismissed the Complaint without prejudice.

Lightfoot refiled an AMENDED COMPLAINT (ECF No. 23) on May 10, 2017. The Amended Complaint names the following individuals as defendants[2]: Richmond Public Schools ("RPS")[3], Dana T. Bedden

---

[1] The Motion to Dismiss was filed by the School Board for the City of Richmond ("RPS"), Kimberly Gray ("Gray"), individually and in her official capacity as a member of the RPS Board, Kristen Larson ("Larson"), individually and in her official capacity as a member of the RPS Board, Donald Coleman ("Coleman"), individually and in his official capacity as a member of the RPS Board, Jeffrey Bourne ("Bourne"), individually and in his official capacity as a member of the RPS Board, Derik Jones ("Jones"), individually and in his official capacity as a member of the RPS Board, Glen Sturtevant ("Sturtevant"), individually and in his official capacity as a member of the RPS Board, Dana T. Bedden ("Bedden), individually and in his official capacity as Superintended at Richmond Public Schools, and Anthony Leonard ("Leonard"), individually and in his official capacity as Executive Director of Elementary Schools at Richmond Public Schools.

[2] Lightfoot did not include in the Amended Complaint several individuals whom he had previously included as Defendants in the original complaint.

[3] In the original Complaint, Lightfoot incorrectly identified one of the Defendants as Richmond Public Schools ("RPS"). The

("Bedden"), individually, and David Hudson, individually. The Amended Complaint sets forth six claims. COUNT 1 asserts a violation of Title VII, and, although it is described as "Hudson's Sexual Harassment of Lightfoot," the count is alleged only against RPS. (AC, ¶ 23). COUNT 2 asserts a violation of Title VII, and, although it is described as "Hudson's Retaliation Against Lightfoot Because He Rejected Hudson's Sexual Overtures," it is alleged only against RPS. (AC, ¶ 31). COUNT 3 asserts a violation of Title VII, and, although it is described as "Retaliation Hudson Recommends Nonrenewal of Lightfoot's Assistant Principal Position," it is only alleged against RPS. (AC, ¶ 36). COUNT 4 asserts a claim against Hudson for Hudson's Tortious Interference with Lightfoot's Employment Contract. COUNT 5, alleged against RPS and Bedden, challenges Bedden's Decision to Nonrenew Lightfoot's Contract as a violation of Lightfoot's Due Process Rights. COUNT 6, also alleged against RPS and Bedden, asserts Bedden's Failure to Give Lightfoot an Opportunity to Respond as a denial of Lightfoot's Procedural Due Process Rights.

---

Defendant corrected the Plaintiff's error in the original motion to dismiss, highlighting that the proper name for the Defendant is the School Board of the City of Richmond. Lightfoot has continued to identify that Defendant with the improper name and the acronym RPS. For purposes of this Opinion, the Court will continue to refer to that Defendant as "RPS".

All Defendants filed their respective motions to dismiss. By separate Memorandum Opinion and Order, the Court granted DEFENDANT DAVID HUDSON'S MOTION TO DISMISS (ECF NO 27).

The Amended Complaint provides as follows: In the summer of 2014, Lightfoot worked as a school counselor for the Richmond Public School ("RPS"). (AC, ¶ 12). David Hudson ("Hudson") was and remains the Principal of Linwood Holton Elementary School. Id. at ¶ 11.

In the summer of 2014, during a track meet, Hudson approached Lightfoot and stated that Lightfoot looked familiar. Id. "Lightfoot told Hudson that he was currently seeking an administrative position and Hudson responded that he was seeking to appoint an assistant principal at Holton Elementary and that Lightfoot should send him his resume." Id. at ¶ 14. "Hudson told Lightfoot that his lack of experience and training did not matter to him because he would mentor and teach him everything that he needed to know and that he would develop Lightfoot into a principal in two to three years." Id. at ¶ 17.

Hudson subsequently recommended Lightfoot for the assistant principal position at Holton Elementary to Anthony Leonard ("Leonard"), the Assistant Superintendent of RPS, and Dana T. Bedden ("Bedden"), the Superintendent of RPS. Id. at ¶ 19. "Leonard and Bedden did not agree with Hudson's request pointing out to Hudson that Lightfoot lacked classroom and supervisory

experience during his employment with RPS." Id. at ¶ 20. "Hudson was resolute and insistent . . . [and] Bedden and Leonard reluctantly approved the appointment." Id. at ¶¶ 21-22.

"During the first week of September 2014, which was at the start of the 2014-2015 school year", Lightfoot noticed "Hudson was intently gazing at his crotch." Id. at ¶ 24. Hudson said to Lightfoot, "I have expensive taste - you need to take me to the Ritz-Carlton in Washington, DC." Id. at ¶ 25. Lightfoot decided not to respond to Hudson's comment, for fear that "any response would have jeopardized his position." Id. at ¶ 27. Lightfoot alleges that Hudson made at least ten or more sexually suggestive comments to him after the first incident, "such as, 'when are you going to take me to dinner?'" Id. at ¶ 29.

"When it became clear to Hudson that Lightfoot was not interested in his sexual overtures, Hudson began a campaign to punish Lightfoot's rejection of his sexual overtures which created for Lightfoot a hostile work environment." Id. at ¶ 33. "In the last week of August, 2014, Hudson gave Lightfoot a list of items to complete but did not specify the time in which he expected the list to be completed." Id. at ¶ 36(a). When Lightfoot did not finish the tasks by the next week, "Hudson responded that he felt that a week was ample time to complete the list. When Lightfoot explained that he needed more time and help to complete the list, Hudson replied, "I can't evaluate you

if I don't know what you can do." Id. at ¶ 36(c). In November of 2014, Lightfoot asked Hudson for help regarding a science museum field trip but "Hudson refused and told Lightfoot that he, Hudson, needed to see what he, Lightfoot, could do." Id. at ¶ 36(e). On another occasions, Hudson told Lightfoot "to revise the cafeteria schedule and rearrange the cafeteria tables and adjust the lunch times." Id. at ¶ 36(f). Because of his short tenure in his position, Lightfoot did not know the details to complete this task and "Hudson offered Lightfoot no assistance with regard to this task." Id.

On February 9, 2015, Hudson delivered a letter to Lightfoot, regarding an "IEP" meeting on February 4, 2015 "which Lightfoot inadvertently failed to attend because he was at the University of Richmond attending a Leadership Academy meeting." (Amend. Compl. ¶ 37). The letter indicated that Hudson was concerned about Lightfoot's performance as assistant principal. Id.

In response to the letter, Lightfoot requested a meeting with Leonard in order to "advise him of Hudson's treatment and to seek his advice." Id. at ¶ 38. Lightwood did not reveal to Leonard the alleged harassment by Hudson but instead described the "other" treatment by Hudson. Id. at ¶ 41. Leonard advised Lightfoot that Hudson had already spoke with him prior to the meeting and Hudson told Leonard about Lightfoot missing the IEP

6

meeting. Id. at ¶ 40. Leonard subsequently called Hudson and explained that "Hudson had fought to get Lightfoot hired" and therefore "Hudson now had to mentor and train Lightfoot . . . ." Id. ¶ 42.

The next day, Hudson made a comment to Lightfoot stating, "[o]h, you went to Dr. Leonard to tell on me" to which Lightfoot did not respond. Id. at ¶ 43. The following day, Hudson told Lightfoot he was going to "non-renew" him, and told Lightfoot "[t]rust me, I will get you." Id. at ¶¶ 43-44.

In March 2015, Hudson recommended to Bedden that because of "alleged performance problems" Lightfoot be non-renewed as an assistant principal for the 2015-2016 year. Id. at ¶ 46. "To support his nonrenewal recommendation, Hudson turned over to HR several letters which he claimed he gave to Lightfoot at the time they were written." Id. at ¶ 47. One of the letters, dated September 9, 2014, reflected Hudson's concerns that "Lightfoot was not meeting his timelines and that his productivity was in need of evaluation." Id. at ¶ 48. Lightfoot "concedes that he received" the letter; however, he alleges that "Hudson falsely claimed Lightfoot signed it." Id. Another letter, from November 24, 2014, warned Lightfoot that Hudson "saw certain deficiencies in Lightfoot's job performance". Id. at ¶ 50. Lightfoot alleged that "Hudson falsely represented" Lightfoot's signature on this letter, and

7

that Lightfoot only saw the letter after Hudson's nonrenewal recommendation in March. Id. at ¶¶ 52, 41.[4] A similar letter, dated February 9, 2015, from Hudson, was also turned over to HR and included Lightfoot's signature. Id. at ¶¶ 53-54.

The AC alleges that Hudson's nonrenewal to Bedden violated Leonard's instructions to mentor Lightfoot. Id. at ¶ 55. Furthermore, given the close proximity of the recommendation for nonrenewal and Lightfoot's meeting with Leonard, Leonard should have known that the "nonrenewal recommendation by Hudson clearly constituted retaliation on the part of Hudson because of Lightfoot's meeting with Leonard." Id. at ¶ 56. Further, Lightfoot alleges that Leonard did not "advise Bedden of his communications with Hudson". Id. at ¶ 57.

"On March 23, 2015, Lightfoot submitted a grievance to Bedden challenging Hudson's recommendation for his nonrenewal to the position of assistant principal." Id. at 37. Lightfoot explained "in his rebuttal that although he was given the September 9, 2014 letter, he never signed it" nor did he see the letter from November 24, 2014 until after he was noticed of Hudson's nonrenewal recommendation. Lightfoot also told Bedden

---

[4] At this point in the Amended Complaint, i.e. paragraph 57, Plaintiff chose to re-start his numbering at paragraph 36. For purposes of this memorandum, the Court will reference the paragraphs as numbered in Plaintiff's Amended Complaint.

8

that the signatures on both the September and November letters were false. Id. at ¶ 41. Hudson denied having forged Lightfoot's signature. Id. at ¶ 42.

On April 16, 2015, Lightfoot met with Leonard and for the first time "shared with Leonard his sexual harassment charges against Hudson." Id. at ¶ 51.

On April 23, 2015, Bedden "submitted a decision on Lightfoot's grievance." Id. at ¶ 43. Bedden determined that Lightfoot would continue as assistant principal for the remainder of the 2014-2015 school year. For the upcoming school year, Bedden "decided that Lightfoot would be reassigned to a school counselor position not to another assistant principal position and that he could apply for and be considered for any positions that he was qualified to hold." Id. at ¶ 43(b). Bedden also granted Lightfoot's request to be transferred to another school location for the remainder of the year. Finally, Bedden ordered a further investigation of the nonrenewal issue by Leonard. Id at ¶ 47(b). Lightfoot alleges that in making his decision, Bedden did not address Lightfoot's allegation that Hudson forged Lightfoot's signatures on the letters.

"On May 18, 2015, Lightfoot met with Bedden and Leonard and reiterated his claims that Hudson sexually propositioned and harassed him." Id. at ¶ 53. At some point, Bedden retained the law firm of "Sands Anderson to conduct an investigation of the

9

sexual harassment charges against Hudson." Id. at ¶ 54. On June 4, 2015, the law firm issued a report to Bedden, concluding that "there was insufficient evidence to support Lightfoot's claims of sexual harassment against Hudson". Id. at ¶ 55.

On June 12, 2015, Bedden and Leonard met with Lightfoot and gave him a copy of the Sands Anderson Report. Bedden did not provide any details about the report or explain whether Lightfoot had an opportunity to respond to the report which, Lightfoot alleges, "was a[sic] especially critical because Lightfoot was the first person interviewed by the investigators who shared with other persons interviewed including Hudson, Lightfoot's claims and statements; and the investigators did not go back to Lightfoot to share with him the statements made by the other persons interviewed, especially those persons whose version was at odds with his version." Id. at ¶ 60. Lightfoot alleges that because he was not given the opportunity to respond, he was "denied the opportunity to counter Hudson's denial evidence from telephone records in his possession which showed that between June 7, 2014 and August 15, 2014 there were numerous telephone calls made from Lightfoot's cell phone [] to Holton Elementary School [] and to and from Hudson's cell phone []." Id at ¶ 62.

Lightfoot requests relief in the form of reinstatement to his former position as assistant principal, back pay, front pay

and five million dollars for pain and suffering, humiliation, embarrassment, and inconvenience.

## ANALYSIS AND APPLICATION OF LAW

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) challenges the legal sufficiency of a complaint. Jordan v. Alternative Resources Corp., 458 F.3d 332, 338 (4th Cir. 2006). When deciding a motion to dismiss under Rule 12(b)(6), a court must "draw all reasonable inferences in favor of the plaintiff." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 253 (4th Cir. 2009). While the court "will accept the pleader's description of what happened" and "any conclusions that can be reasonably drawn therefrom," the court "need not accept conclusory allegations encompassing the legal effects of the pleaded facts." **Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure** § 1357 (3d ed.1998); Chamblee v. Old Dominion Sec. Co., L.L.C., No. 3:13CV820, 2014 WL 1415095, *4 (E.D. Va. 2014). The court is not required to accept as true a legal conclusion unsupported by factual allegations. Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009).

RPS and Bedden challenge Lightfoot's claim as to the counts asserted against them, specifically COUNTS 1, 2, 3, 5, AND 6. Each will be addressed in turn.

## A. The Amended Complaint Does Not Present a Plausible Claim for a Hostile Work Environment in Violation of Title VII as Alleged in Count 1

In COUNT 1, Lightfoot alleges that "Hudson's sexually explicit overtures unreasonably interfered with Lightfoot's work performance and created an intimidating, hostile, and offensive work environment." (AC, ¶ 30).[5] Title VII renders it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to [his] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

"To establish a Title VII hostile work environment claim based on sex, a plaintiff must show that 'the offending conduct (1) was unwelcome, (2) was based on h[is] sex, (3) was sufficiently severe or pervasive to alter the conditions of h[is] employment and create an abusive work environment, and (4) was imputable to h[is] employer.'" Sonnier v. Diamond Healthcare Corp., 114 F. Supp. 3d 349, 355 (E.D. Va. 2015) (quoting Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 331 (4th Cir.

---

[5] The conduct, as alleged in the Amended Complaint, provides that Hudson, a male, created a hostile work environment for Lightfoot, another male, through his sexual overtures. The Supreme Court has explained "that nothing in Title VII necessarily bars a claim of discrimination [] merely because the plaintiff and the defendant (or the person charged with acting on behalf of the defendant) are of the same sex." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 79 (1998).

12

2003)). RPS and Bedden first argue that the conduct complained of in the Amended Complaint is not sufficiently severe or pervasive to constitute a violation of Title VII.

In analyzing the allegations presented in the Amended Complaint, it is necessary to keep in mind that "[t]he prohibition of harassment on the basis of sex requires neither asexuality nor androgyny in the workplace; it forbids only behavior so objectively offensive as to alter the 'conditions' of the victim's employment." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998). Further, "the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." Id. (internal citations omitted). The Supreme Court has directed district courts to consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998) (internal citations omitted).

As alleged in the Amended Complaint, in a one-on-one meeting in early September 2014, Hudson looked intently at Lightfoot's crotch and, while so doing, Hudson said: "I have expensive taste – you need to take me to the Ritz-Carlton in Washington, D.C." (AC, ¶¶ 24-25). Notwithstanding the

13

Defendants' contention to the contrary, this comment must be considered at the pleading stage as a sexually suggestive remark. The only other particulars offered in support of the hostile work environment claim appear in the conclusory allegation that "Hudson on at least ten or more subsequent occasions made several sexually suggestive comments to Lightfoot such as, 'when are you going to take me to dinner?'"

One sexually suggestive remark is not enough to constitute a hostile work environment. See Smith v. First Union Nat. Bank, 202 F.3d 234, 242 (4th Cir. 2000)("A work environment *consumed* by remarks that intimidate, ridicule, and maliciously demean the status of women [or men] can create an environment that is as hostile as an environment that contains unwanted sexual.")(emphasis added). And, a conclusory allegation that there were "ten or more other sexually suggestive comments" does not satisfy either Twombly[6] or Iqbal[7] especially when that conclusory allegation is modified by the non-sexually suggestive phrase such as, "when are you going to take me to dinner?" The

---

[6] Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007).

[7] Ashcroft v. Iqbal, 556 U.S. 662 (2009).

14

Twombly and Iqbal demand for plausibility cannot be satisfied by such summary and conclusory allegations.

For the foregoing reasons, COUNT 1 is legally insufficient. Lightfoot has been afforded leave to amend and has not yet presented a viable hostile work environment claim. He now must suffer dismissal.

**B.    The Amended Complaint does Not Present a Plausible Claim for Any Title VII Relation Violations as to COUNTS 2 and 3**

As to COUNT 2, Lightfoot alleges that RPS and Bedden Violated Title VII because "Hudson[] retaliate[ed] against Lightfoot because he rejected Hudson's sexual overtures." Lightfoot alleges that, "[w]hen it became clear to Hudson that Lightfoot was not interested in his sexual overtures, Hudson began a campaign to punish Lightfoot's rejection of his sexual overtures which created for Lightfoot a hostile work environment." (AC, ¶ 33).

Under Title VII, in order to show a prima facia case of relation, a plaintiff must demonstrate that "(1) that []he engaged in protected activity, (2) that an adverse employment action was taken against [him], and (3) that there was a causal link between the protected activity and the adverse employment action." Laughlin v. Metro. Washington Airports Auth., 149 F.3d 253, 258 (4th Cir. 1998). "Protected activities fall into two distinct categories: participation or opposition. [] An employer

15

may not retaliate against an employee for participating in an ongoing investigation or proceeding under Title VII, nor may the employer take adverse employment action against an employee for opposing discriminatory practices in the workplace." Id. at 259.

The Amended Complaint does not plead that Lightfoot participated in a protected activity. It is clear that he did not engage in an ongoing investigation or proceeding. Furthermore, Lightfoot did not oppose a discriminatory practice in the workforce.

> Opposition activity encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities. []. To determine whether an employee has engaged in legitimate opposition activity we employ a balancing test. [] We balance the purpose of the Act to protect persons engaging reasonably in activities opposing . . . discrimination, against Congress' equally manifest desire not to tie the hands of employers in the objective selection and control of personnel.

Laughlin, 149 F.3d at 259 (internal citations omitted). The Amended Complaint does not describe any protected activity. Instead, it describes conduct by Hudson whereby he criticized Lightfoot's performance, including Lightfoot's inability to complete a list of items in August 2014, Lightwood's inability to organize a science museum field trip in November of 2014, and

16

Lightfoot's lack of experience in organizing the cafeteria and lunch schedule. For these reasons, the Court cannot find that a plausible Title VII claim for retaliation exists based on Lightfoot's rejection of Hudson's alleged sexual overtures. COUNT 2 therefore will be dismissed.

As to COUNT 3, Lightfoot alleges that RPS and Bedden violated Title VII based on Hudson's retaliation by recommending nonrenewal of Lightfoot for the assistant principal position. In February 2015, Lightfoot explains that, after he inadvertently missed an "IEP" meeting, he went to meet with Leonard, the Assistant Superintendent of RPS. (AC, ¶ 37). During this meeting, "Lightfoot told Leonard about Hudson's treatment of him as set forth above [paragraphs 1-36], leaving out the sexual overtures." Id. at ¶ 41. "The next day, Hudson told Lightfoot that he was going to 'non-renew' him. Hudson further stated, 'I never lose, I always win!' Lightfoot then responded, 'Do what you got to do'." Id. at ¶ 44. In March 2015, Hudson recommended nonrenewal of Lightfoot. Lightfoot believes that the recommendation of nonrenewal constitutes retaliation.

Even if Hudson did in fact "retaliate" against Lightfoot by recommending nonrenewal after Lightfoot complained to Leonard about Hudson's treatment, Lightfoot alleges Count 3 against RPS and Bedden, not against Hudson. Therefore, it is irrelevant

whether Hudson was acting in a retaliatory manner. Nowhere in the Amended Complaint does Lightfoot allege that RPS or Bedden retaliated against him for his conduct. Further, Lightfoot admits in the Amended Complaint that he did not complain to Leonard about Hudson's "sexual overtures." Under the state of these pleadings, Lightfoot has failed to plead a key element of a retaliation claim: engagement in a protected activity. Thus, COUNT 3 is legally insufficient.

**C.    The Amended Complaint does Not Present a Plausible Claim for Any Due Process Violation as to COUNTS 5 and 6**

In COUNT 5, Lightfoot alleges that "Bedden's Decision to Nonrenew Lightfoot Lacked Substantial Evidence and Bedden's Reliance on Questionable Documents Denied Lightfoot's Due Process Rights." In COUNT 6, Lightfoot alleges that "Bedden's Failure to Give Lightfoot an Opportunity to Respond to the Sands Anderson Report and Relying on the Report Denied Lightfoot's Procedural Due Process Rights." In both instances, Lightfoot is claiming a violation of his due process rights.

"In order to make out either a substantive or procedural due process claim, a plaintiff must allege sufficient facts to support a finding that the [he/she] "[was] deprived of life, liberty, or property, by governmental action." Beverati v. Smith, 120 F.3d 500, 502 (4th Cir.1997). A protected property interest cannot be created by the Fourteenth Amendment itself,

but rather must be created or defined by an independent source." Equity In Athletics, Inc. v. Dep't of Educ., 639 F.3d 91, 109 (4th Cir. 2011). Public employees may have a constitutionally protected property interest in their employment. See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542, 546 (1985).

In Virginia, a public school administrator has a property interest in the job only once the employee "obtains continuing contract status." Hibbitts v. Buchanan Cty. Sch. Bd., 433 F. App'x 203, 206 (4th Cir. 2011). **Va. Code 221.294(A)** provides that an assistant principal is not under contract until the principal has served in the position for three years. ("A person employed as a principal, assistant principal, or supervisor, including a person who has previously achieved continuing contract status as a teacher, shall serve a *probationary term of three years* in such position in the same school division before acquiring continuing contract status as principal, assistant principal, or supervisor.").

Based on **Va. Code 221.294(a)**, Lightfoot, as a new assistant principal in a probationary status, did not have a property interest in his job. He was neither tenured nor contracted for a period longer than the 2014-2015 school year. Therefore, the Amended Complaint fails to allege cognizable claims for a due process violation in COUNTS 5 and 6.

## CONCLUSION

For the reasons set forth above, DEFENDANTS' MOTION TO DISMISS (ECF No. 25) will be granted as to COUNTS 1, 2, 3, 5, and 6. These counts will be dismissed with prejudice.

It is so ORDERED.

/s/ REP
Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: August 11, 2017